J-S33033-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.K.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 4082 EDA 2017 |

Appeal from the Order Entered November 14, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000775-2017,
CP-51-DP-0002461-2014

BEFORE:   OTT, J., McLAUGHLIN, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:               **FILED AUGUST 03, 2018**

Appellant, S.B. ("Mother"), appeals the order entered by the Philadelphia County Court of Common Pleas granting the petition of the Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor, dependent son, J.K.A.B. ("Child"), born in October 2014, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  Although Mother is solely appealing the termination order at docket number CP-51-AP-0000775-2017, her notice of appeal also references the dependency docket, CP-51-DP-0002461-2014.  We affirm the

_____

[1] By separate order entered on August 28, 2017, the trial court involuntarily terminated the parental rights of Child's father, J.B. ("Father") and of those of unknown putative father.  Father filed an appeal addressed by a separate memorandum at Superior Court Docket No. 3435 EDA 2017.  No unknown father has filed an appeal or is a party to the instant appeal.  In addition, at the August 28, 2017 hearing, the court also ruled on dependency issues as to Mother's youngest child, A.J., who is not the subject of the instant appeal.

_____

*   Former Justice specially assigned to the Superior Court.

trial court's order terminating Mother's parental rights (docketed at CP-51-AP-0000775-2017) and quash Mother's appeal on the dependency docket (CP-51-DP-0002461-2014).

The trial court summarized the relevant procedural and factual history, in part, as follows:

> On October 20, 2014, [DHS] received a General Protective Services ("GPS") report alleging that the Child and Mother tested positive for marijuana at Child's birth.[2] Child was placed in a foster home through Tabor Child's Services, where Child has remained since placement.[3] An adjudicatory hearing was held on February 23, 2015, before the Honorable Jonathan Irvine who adjudicated [] Child dependent.
>
> Throughout the involvement of DHS and later the Community Umbrella Agency ("CUA"), the court held regularly scheduled Permanency Review hearings to monitor the parent[s'] compliance with court orders and the CUA Single Case Plan ("SCP"). These SCP meetings were held to assist the family with complying with all objectives and to provide any and all appropriate services as an aid to facilitate reunification. On November 7, 2014, CUA held the initial Single Case Plan ("SCP") meeting. The goal was reunification. The objectives for Mother were the following: (1) to attend parenting classes; (2) to participate in programs with Achieving Reunification Center ("ARC"); (3) to visit Child; (4) to have a parenting capacity evaluation ("PCE), and (5) to follow the recommendations of the PCE. . . .

_____

[2] The family had been known to DHS since at least February 2012 due to the death of a child of Mother. During investigation, DHS learned that yet two other children died in 2008 and 2009, respectively. Petition for Termination of Parental Rights, 8/4/17, Exhibit "A," Statement of Facts, ¶¶a-d. The cause of the deaths of two of the three children were undetermined. ***Id.***

[3] As testified to by CUA case manager, Nick Sarro, Child was initially placed in a foster home, then placed with Maternal Grandmother for four months, and finally placed in his current foster home in January 2016. Notes of Testimony ("N.T."), 8/28/17, at 40.

Trial Court Opinion ("T.C.O."), 2/16/18, at 2-3.

On August 4, 2017, DHS filed separate petitions to involuntarily terminate Mother's and Father's parental rights and for a goal change. The trial court conducted hearings on August 28, 2017 and November 14, 2017. DHS presented the testimony of Nick Sarro, CUA case manager; Brianna Randolph, CUA visitation coach; and Dr. William Russell, who conducted two parenting capacity evaluations of Mother and was stipulated to be an expert in assessing parenting capacity. Mother, who was present and represented by counsel, testified on her own behalf. Child was represented by both a Guardian *Ad Litem* ("GAL") and legal counsel, who both supported the termination of Mother's parental rights.[4]

While the trial court terminated Father's parental rights at the August 28, 2017 hearing, the court held its decision with respect to Child's permanency goal in abeyance for Mother to have the opportunity to sign a voluntary relinquishment of her parental rights, and the matter was re-listed for November 14, 2017.

---

[4] This Court has recently held that we will address *sua sponte* the responsibility of an orphans' court to appoint counsel pursuant to 23 Pa.C.S.A. 2313(a). **See In re K.J.H.**, 180 A.3d 411, 413 (Pa.Super. 2018). In **In re Adoption of L.B.M.**, ___Pa.___, 161 A.3d 172, 180 (2017) (plurality), our Supreme Court held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. As the trial court in this case appointed a GAL for to advocate for Child's best interests and legal counsel to advocate for Child's legal interests, we find the trial court fulfilled its responsibility to appoint counsel pursuant to Section 2313(a).

At the November 14, 2017 hearing, after Mother declined to voluntarily terminate her parental rights, the trial court placed its decision on the record to involuntarily terminate Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b); this order was docketed at CP-51-AP-0000775-2017. Further, by a separate order entered the same day, the trial court changed Child's permanency goal from reunification to adoption; this order was docketed at CP-51-DP-0002461-2014.

On December 8, 2017, Mother filed one notice of appeal as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] The notice of appeal indicated that Mother was appealing "the order in this matter on the 14th day of November of 2017" on Docket No. CP-51-AP-0000775-2017; however, there is also a handwritten notation adding Docket No. CP-51-DP-0002461-2014 to the notice of appeal. Notice of Appeal, 12/8/17, at 1.

On appeal, Mother raises the following issues for our review:

1. Did [DHS] sustain the burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2. Was there sufficient evidence presented to establish that it was in the best interest of the child to terminate Mother's parental rights?

---

[5] Notably, counsel then submitted another and different Rule 1925(b) statement with his appellate brief. As the Rules of Appellate Procedure do not provide for the filing of an amended or second concise statement with the brief, we do not consider this second statement.

- 4 -

Mother's Brief at 4.

As a preliminary matter, we must determine whether Mother properly filed the appeal before this Court. At first glance, it appears that Mother attempted to file a single notice of appeal of two separate orders on two separate dockets: the termination order at docket number CP-51-AP-0000775-2017 and the permanency review goal change order on the dependency docket at CP-51-DP-0002461-2014. We note that the issues decided in these orders are wholly distinct; this Court has clarified that:

> Except in Philadelphia and Allegheny County, under the Juvenile Act jurisdiction to determine the propriety of the placement goal is vested exclusively in the juvenile division of the court of common pleas. 42 Pa.C.S.A. § 6302 and official comment thereto. The jurisdiction of the Orphans' Court is to terminate parental rights and is derived from a different statute. Pa.Stat.Ann. tit. 23, § 2102 and official comment thereto. Thus, the issues and proceedings before the juvenile court, on one hand, and the Orphans' Court on the other, are distinct.

*In re Interest of M.B.*, 565 A.2d 804, 809 (Pa.Super. 1989). While in this case the Philadelphia County Family Court Division resolved both issues, the lower court filed separate orders on separate dockets.

In the recent decision in ***Commonwealth v. Walker***, ___ Pa. ___, ___ A.3d ___, 33 MAP 2017 (Pa. filed June 1, 2018), our Supreme Court held that there is a bright-line requirement that a single notice of appeal will not be adequate to appeal orders entered on more than one trial court docket; the ***Walker*** court cited to the 2013 amendment to the Official Comment in Pa.R.A.P. 341 which states "[w]here ... one or more orders resolves issues

- 5 -

arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed." Pa.R.A.P. 341, Official Note.

However, in this case, although Mother's notice of appeal lists two different dockets, Mother's indication that she was appealing the order entered on November 14, 2017 refers to the trial court's order terminating her parental rights on docket number 0000775-2017 and not the order changing the permanency goal from unification to adoption on docket number CP-51-DP-0002461-2014. Mother does not challenge the goal change in the statement of questions presented section of her appellate brief and does not develop any argument with respect to this issue on appeal.[6] Thus, due to this procedural misstep, we quash Mother's appeal at the dependency docket, CP-51-DP-0002461-2014.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported,

---

[6] *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them in the concise statement of errors complained of on appeal results in a waiver of those issues)(citing Pa.R.A.P. 2116); *see also In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived"); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).

appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 7 -

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decrees pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of

- 9 -

services, may properly be rejected as untimely or disingenuous." ***In re A.L.D.***, 797 A.2d at 340 (internal quotation marks and citations omitted).

Further, as to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). In ***In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]***, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

***In re T.S.M.***, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case at bar, in finding grounds for termination pursuant to Section 2511(a)(1), (2), (5), and (8), and that termination was in Child's best interests pursuant to Section 2511(b), the trial court reasoned:

> Child was born [in] October [], 2014 and adjudicated dependent on February 23, 2015. The record demonstrated Mother's ongoing unwillingness to provide care or control for [] Child; to perform any parental duties and a failure to remedy the conditions that brought [] Child into care in a reasonable period of time. Specifically, two Parenting Capacity Evaluations in 2015 and 2017 opined that Mother lacked the capacity to parent [] Child due to significant cognitive impairment. It was unlikely that these impairments could be addressed in a reasonable period of time or that any possible government service could ameliorate Mother's condition or give her the ability to parent [] Child. The record also demonstrated that three (3) children had previously died in the care of Mother. The causes that precipitated the deaths of these three children were unknown. [] Child had been in foster care throughout [] Child's entire life. As a result, [] Child's parenting bond was not with the Mother but rather [] Child's foster parent. The evidence was clear and convincing that the Child's foster parent met all of [] Child's daily needs. The facts provided to the [c]ourt at the Termination of Parental Rights Hearing demonstrated clear and convincing evidence that termination of Mother's parental rights would be in the best interest of [] Child pursuant to 23 Pa. C.S.A. §§2511(a)(1)[,] (2)[,] (5)[,] (8) and 23 Pa.C.S.A. § 2511(b).

At the hearing, DHS introduced testimony of Dr. William Russell which included his opinion that Mother lacked the capacity to parent Child. During the hearing on August 28, 2017, which was later incorporated into the November 14, 2017 hearing, Dr. Russell testified that he had completed Parenting Capacity Evaluations in 2015 and 2017. The opinion of both evaluations was that Mother lacked the capacity to parent Child because she suffered from a major depressive disorder and lacked the necessary insight as to parent responsibly and effectively. Mother also had borderline cognitive function which made it difficult to make plans for herself or to make decisions. Dr. Russell testified that Mother's employment was sporadic and housing unstable. Of great concern was Mother's inability to develop a significant insight as to causes that precipitated the deaths of three of her children. As a result, Dr. Russell was able to testify with a reasonable degree of medical certainty that Mother was unable to provide safety and permanency to [] Child in the foreseeable future. The CUA [r]epresentative also testified that Child's foster parent provided safety and stability for Child and that the foster parent provided for [] Child's daily needs. The testimony of the CUA [r]epresentative and Dr. Russell was deemed to be credible and accorded great weight. Based upon this testimony and the documents in evidence, this [c]ourt found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1)[,] (2)[,] (5) and (8). This [c]ourt further concluded that termination of [] Mother's parental rights would be in the best interest of Child pursuant to 23 Pa.C.S.A. § 2511(b). This [c]ourt also concluded that Child had a bond with his foster parents who were able to provide for all of [] Child's needs.

T.C.O. at 4-6 (citations to record omitted) (footnotes omitted).

Mother, however, vaguely argues as to subsection (a) that she was complying with her single case plan objectives, as well as the recommendations of the parenting capacity evaluation. Mother's Brief at 10-11. Moreover, Mother additionally maintains that she was not provided any services to assist with her cognitive impairment. *Id.* at 11. We disagree.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). Despite treatment, Mother failed to

alleviate concerns with regard to her mental health and possessed borderline cognitive functioning. N.T., 8/28/17, at 49-52. As noted by Dr. Williams, Mother was diagnosed with major depressive disorder, and, although she was attending treatment, she was not participating as she should. Despite Dr. Williams's recommendations, Mother was not discussing the deaths of her children who had passed for reasons undetermined, and was not discussing her prior sexual abuse. *Id.* at 49-53, 57-58.

As expressed by Dr. Williams, "[t]he significant mental health issue combined with her borderline cognitive functioning to begin with certainly leaves her in a very precarious position when she doesn't have any sort of very concrete set of alternatives to turn to where she's going to have to plan and make plans herself looking at alternatives. She doesn't do alternative thinking very well." *Id.* at 53-54. Dr. Williams further found the medication aspect of Mother's treatment was inconsistent. *Id.* at 51. In addition, Mother lacked stable housing and steady employment. *Id.* at 53, 69.

Moreover, Dr. Williams observed no improvement in the time between Mother's evaluations and suggested that he did not have reason to believe Mother would be able to provide for Child's safety and permanency within a reasonable time. *Id.* at 54-55. Mr. Sarro additionally raised concerns due to Mother's domestic violence history and Mother's continued "on and off" relationship with her youngest child's father. *Id.* at. 63-64. As we discern no abuse of discretion or error of law, we do not disturb the court's findings.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. **See In re Adoption of M.E.P.**, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. **See id.**

As to subsection (b), Mother argues that there was "insufficient evidence to establish that it was in the best interest of the child to be adopted." Mother's Brief at 13. Mother points to the lack of a bonding evaluation and the fact that the court relied only on the testimony of the agency worker. **Id.** We again disagree.

Upon review, we discern no abuse of discretion as to the trial court's finding that the Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). Significantly, aside from the safety and permanency concerns addressed above, Child was removed from Mother when he was just days old. N.T. at 65. At the time of the hearing, Child had been in care for approximately three years, essentially his entire life, and in his current pre-adoptive foster home for approximately one and a half years. **Id.** at 18, 24,

26, 64. As described by CUA case manager, Nick Sarro, Child's primary parental bond was with his foster parents, who provide love, safety, and stability and meet his general, medical, and developmental needs. *Id.* at 64-65. Further, there is another child in the home who Child views as a sibling and with whom Child is bonded. *Id.* at 66-67.

While Mother maintained regular visitation with Child, such visitation never progressed beyond supervised visitation. *Id.* at 62, 72. In addition, Brianna Randolph, the CUA visitation coach who supervised the visitation between Mother and Child, testified, while Child acknowledged Mother as his mother, there were no problems separating at the end of visits. *Id.* at 70-71. Ms. Randolph further indicated that the interaction between Mother and Child during visits was "minimal to [] moderate," noting that Mother was "observ[ant]" and "attentive," but not physically interactive. *Id.* at 72-73.

As such, Mr. Sarro and Ms. Randolph testified that they had no reason to believe it would cause any harm to child to terminate Mother's parental rights and change Child's goal to adoption. *Id.* at 65, 71-72. Likewise, Child's legal counsel, Carla Beggin, Esquire,[7] noted that she observed Child in his foster home and offered as follows:

> I did see [Child] in [his foster] home yesterday. He seems like a very happy, healthy three-year-old. He seemed very bonded with the foster parents. He lives in a lovely home. He has lots of toys. Lots of educational toys and games. So I would be in full support of [Child] staying where he is and for adoption.

---

[7] We observe that counsel refers to herself as the Child Advocate and that counsel and the GAL are at times referred to with differing terminology.

- 15 -

*Id.* at 35-36.

Thus, as confirmed by the record, termination of Mother's parental rights serves the Child's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As indicated, at the time of the hearing, Child had already been in care for approximately three years, and residing in his current pre-adoptive foster home for approximately a year and a half, and is entitled permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and changed Child's permanency goal to adoption.

Order at CP-51-AP-0000775-2017 affirmed. Appeal at CP-51-DP-0002461-2014 quashed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/3/18